# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

JENNIFER BALSAMA, )
)
)
       Plaintiff, )
)
v. ) No. 04-CV-806-SAJ
)
JO ANNE B. BARNHART, )
Commissioner of Social Security )
Administration, )
)
       Defendant. )

## OPINION AND ORDER[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2] Plaintiff asserts that the Commissioner erred because (1) the ALJ failed to give appropriate weight to the opinions of Plaintiff's treating physicians; (2) the ALJ erroneously credited the opinion of the Commissioner's psychological expert; (3) the ALJ failed to give specific reasons for dismissing Plaintiff's subjective complaints, and (4) the ALJ failed to consider the effects of Plaintiff's obesity. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born January 12, 1973. [R. at 55]. In her disability report, Plaintiff indicated that she was bi-polar. [R. at 67].

---

[1] This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2] Administrative Law Judge Lantz McClain (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated April 30, 2004. [R. at 13 - 22]. Plaintiff appealed the decision by the ALJ to the Appeals Council. The Appeals Council declined Plaintiff's request for review on September 24, 2004. [R. at 4].

Plaintiff completed a Disability Supplemental Interview Outline form. [R. at 84]. Plaintiff described an average day as waking up, showering, and getting ready for work. [R. at 84]. According to Plaintiff, her current problem is caused by constant mood changes which requires her to adjust on a daily basis, and on some days Plaintiff is unable to get out of bed. [R. at 84]. Plaintiff noted that she has difficulty sleeping because her mind is constantly going. [R. at 84].

Plaintiff noted that she lived in an apartment with two close friends. [R. at 84]. According to Plaintiff, she is unable to keep friends because of her condition. Plaintiff noted that she cannot control her mood swings, and that people do not like her rapidly changing moods. [R. at 84]. Plaintiff noted that she cooks approximately two times each week, and that cooking required quite a bit of time because she frequently had to reread the recipes. [R. at 85]. Plaintiff is able to clean her room and clothes. [R. at 86]. Plaintiff shops for food and personal items approximately once each month for two hours. [R. at 86]. Plaintiff watches television. [R. at 87]. Plaintiff wrote that she had no social activities due to her mood swings. [R. at 88].

In her reconsideration disability report, dated August 13, 2003, Plaintiff wrote that she was unable to be around people, especially groups because Plaintiff would panic and forget what she was supposed to be doing. [R. at 90].

On a "recent medical treatment" report, dated March 5, 2004, Plaintiff noted that she was being treated by Dr. Hunan, and that her doctor had told Plaintiff that Plaintiff could not work. [R. at 97]. Plaintiff's medications list included Zoloft (for anxiety), Depokate (for bi-polar), Seroquel (for paranoia), iron pills (anemia), Accupril (high blood pressure), and Naproxen (knee and pelvic pain). [R. at 98, 100].

Progress notes from Morton Comprehensive Health Services, Inc., dated February 21, 2003, indicate Plaintiff is a 31 year old female who came for an initial visit for bipolar disorder. Plaintiff stated she was 16 when she was put on Prozac but that the Prozac made the manic phase of her bipolar disorder worse. Plaintiff's assessment was of depressive disorder with possible bipolar disorder and exogenous obesity. [R. at 104]. Progress notes dated April 2, 2003, noted Plaintiff's chief complaint as being her bi-polar disorder. Plaintiff also complained that she was unable to sleep at night. [R. at 103]. Plaintiff was referred to family and children's services for counseling. [R. at 103]. Progress notes dated May 6, 2003, indicate Plaintiff was feeling well on Depakote, and that she had a history of a knee injury which was painful at times. A patellar brace and "NSAIDS" were recommended for her knee pain. [R. at 102]. The notes indicated Plaintiff had an appointment with a psychiatrist in one and one-half weeks. The doctor discussed with Plaintiff the importance of diet and healthy lifestyle including exercise. [R. at 102].

Group treatments notes dated May 28, 2003 indicate Plaintiff presented with a cooperative talkative mood and broad affect. Plaintiff interacted with other members. [R. at 108].

Plaintiff was treated by D. Joyce Bumgardner, M.D., at the Associated Centers for Therapy. [R. at 106]. On April 30, 2003, Plaintiff requested medication for bi-polar disorder. Plaintiff noted that she was diagnosed at age 18, but that she had only been treated sporadically. Plaintiff's current symptoms included racing thoughts, depression, crying spells, anxiety, sleeplessness, inability to concentrate, and periods of "zoning out." [R. at 110]. Plaintiff stated that she had been unable to keep a job due to her depression and transient lifestyle. [R. at 110]. On June 13, 2003, Plaintiff reported that she lost control

recently because someone was irritating her. Plaintiff reported being slightly depressed. The doctor assessed Plaintiff with post-traumatic stress disorder with depressive type symptoms, mood swings, and paranoia. [R. at 106].

On July 29, 2003, Minor W. Gordon, Ph.D., completed a psychological evaluation of Plaintiff. [R. at 111]. Plaintiff's chief complaints were bipolar diagnosis at age 16 which Plaintiff stated had become worse. Plaintiff told the doctor that "[i]f I don't take my medicine, I hear someone calling me, I feel like someone is watching me, I can't control my emotions, like today, I can't control my emotions, I didn't take my medicine today and a friend said something to me and I started crying for no apparent reason, I can't go in a large populated store, like if there are more than six people in the store, I feel like they are talking about me, sometimes I forget what I'm doing, I have trouble sleeping at night because my thoughts are racing, but the medicine really helps my symptoms." [R. at 111]. Plaintiff stated that she did not take her medicines that day because she had to go to a funeral that was earlier than she normally took her medications and she did not want to be off-schedule." [R. at 111]. Plaintiff has a history of inpatient treatments in 1989 for two weeks. Plaintiff was treated a total of three months at Associated Centers for Therapy. Plaintiff sees her doctor once every two months and attends group therapy once each week. [R. at 111]. Plaintiff has a nine year old daughter that lives with a cousin. Plaintiff stated that she could not handle being a mother. [R. at 111]. Plaintiff obtained her GED. On a daily basis, Plaintiff plays on the computer, cleans her house, watches television, and cooks. [R. at 112]. Plaintiff was 5'0" tall and stated she weighed 200 pounds. Plaintiff indicated that her normal weight was 130, but that she had gained weight when she stopped smoking. [R. at 112]. Plaintiff's mood was mildly depressed. Plaintiff was noted as

-- 4 --

sleeping well with her medications. Plaintiff's manner and attitude were appropriate. [R. at 112]. Plaintiff's social-adaptive behavior was described as being within normal limits as long as she took her medications. [R. at 112]. "Overall impression gained from the mental status exam was of a 30-year-old female with bipolar disorder effectively treated with her current medication regimen." [R. at 113]. The doctor indicated Plaintiff's "GAF" score as 70. [R. at 113].

A Psychiatric Review Technique form was completed by Sally Varghese, M.D., on August 8, 2003. Dr. Varghese indicated that Plaintiff's impairment was "not severe." [R. at 115]. Plaintiff's restriction of activities of daily living were "mild;" difficulties in maintaining social functioning were "mild;" difficulties in maintaining concentration were "none;" and episodes of decompensation were "none." [R. at 125]. The doctor noted Plaintiff had a remote history of hospitalization in 1989 and three months of therapy and was treated with Prozac at age 16 with no additional treatment until February 2003. [R. at 127]. Plaintiff was noted as being able to take care of her personal needs but tending to socially isolate herself. [R. at 127]. The doctor noted that Plaintiff's symptoms clearly improve on medication. [R. at 127].

Records from Associated Centers for Therapy dated August 11, 2003 note Plaintiff was 243, a wight gain of 24 pounds in three months. [R. at 140]. Plaintiff reported taking her medications faithfully, but reported persistent "paranoia" and difficulty sleeping. [R. at 140]. Plaintiff's thought processes were organized with no signs of psychosis. [R. at 140]. Records dated September 9, 2003, note Plaintiff was taking medications faithfully but not having symptom relief. Plaintiff's sleep was poor. Plaintiff was mildly agitated; thought

process was organized. [R. at 134]. September 29, 2003 notes indicate Plaintiff stated her medicine was making her sleepy. [R. at 131].

On December 5, 2003, Karly Wiemar, BA, who Plaintiff lists as her therapist, completed forms on Plaintiff's assessment. Plaintiff's mood was described as moderate; Plaintiff's thinking slight impairment; Plaintiff's family average; and Plaintiff's interpersonal relationships slight. An "Axis V" number was indicated as "highest" 46 and "current" 45. [R. at 158]. A second form is completed by an unknown individual listing Plaintiff's history and a current GAF of 45 with a fair prognosis. [R. at 161]. Treatment plan was "instigated" on December 2003 with a target date of June 2004. [R. at 159]. A similar form was completed on May 26, 2004. [R. at 185]. Plaintiff's highest and lowest GAF were reported as 45. [R. at 187]. Treatment plan was instigated June 2004, with a target date of December 2004. [R. at 188]. Plaintiff's prognosis was reported as "poor due to hx [history] of noncompliance and lack of motivation towards tx [treatment]." [R. at 191].

On December 23, 2003, Plaintiff reported faithfully taking her medications and having no untoward effects. Plaintiff reported significant levels of anxiety making her uncomfortable with other people. [R. at 152]. On February 13, 2004, Plaintiff was reportedly off of her medications for approximately two weeks because she could not find transportation to pick up her medications. [R. at 148]. Plaintiff reported increased anxiety and panic attacks. Plaintiff noted that all of her basic needs were currently being met. [R. at 148]. On February 18, 2004, Plaintiff was off of her medications. Plaintiff's primary symptoms were increased paranoia and difficulty sleeping. Plaintiff was depressed. [R. at 146]. Plaintiff maintained satisfactory eye contact, was calm and cooperative and coherent. [R. at 146].

On March 24, 2004, Plaintiff reported that she was taking her medications faithfully but was not doing well. [R. at 199]. Plaintiff noted that she had not taken her Depakote that morning. Plaintiff reported evening and night time paranoia. Plaintiff was alert and maintained satisfactory eye contact. [R. at 199]. Plaintiff appeared mildly agitated and moderately anxious. [R. at 199].

On July 6, 2004, Plaintiff reported that she was compliant with her medications. [R. at 179]. Plaintiff's sleep was satisfactory, and Plaintiff reported feelings of paranoia. [R. at 179]. On June 7, 2004, Plaintiff was not compliant with her medications and Plaintiff's symptoms were poorly controlled. [R. at 181]. The importance of routine appointments was emphasized to Plaintiff. [R. at 181].

Plaintiff testified at a hearing before the ALJ on April 20, 2004. [R. at 206]. Plaintiff's attorney stated, at the hearing, that the sole basis of Plaintiff's claim was "psychological." [R. at 209].

Plaintiff completed ninth grade in high school and obtained her GED. [R. at 210]. Plaintiff was in special education classes in high school. [R. at 221]. Plaintiff's last previous work was in February of 2002. [R. at 211]. Plaintiff visits a doctor once each month and stated that the doctors are constantly changing her medications to attempt to get Plaintiff stable. [R. at 212].

According to Plaintiff, she last worked at Wendy's. Plaintiff stated she caught a cold and did not show up for work for approximately six months and tried to, after that, get her job back, but wound up not going back. [R. at 212]. According to Plaintiff, she slips into a deep depression every two years which lasts for approximately two to six months. [R. at 212]. According to Plaintiff, she cycles between highs and lows every day. [R. at 213].

During her periods of deep depression, Plaintiff states that she does not leave the house at all. [R. at 214].

Plaintiff testified that she has held various jobs during the past several years, and that her longest period of employment was for two years. [R. at 214]. Plaintiff stated that she left that job because she moved out of the state. [R. at 215]. Plaintiff noted that she had been fired from several jobs. [R. at 216]. Plaintiff believes she has had at least 20 jobs, and has been fired from 15. [R. at 216]. According to Plaintiff, she was fired because she got into fights or she simply became depressed. [R. at 217].

Plaintiff also stated that she suffers from post-traumatic stress disorder. [R. at 217]. According to Plaintiff, she was molested by her mother's boyfriend and two of their friends over a four year period. [R. at 217].

Plaintiff stated that she moves frequently and that she had lived in Tulsa for the previous past two years and that was the longest amount of time that she had lived in an area while an adult. [R. at 218].

According to Plaintiff, for the previous six months she suffered from anxiety attacks. Plaintiff stated that she sweats heavily, has difficulty remembering things, and sometimes has difficulty talking. [R. at 219]. Plaintiff also stated that she sometimes hears voices at night and cannot take a shower without someone being with her. [R. at 220].

Plaintiff lives in an apartment with two other people. [R. at 222]. Plaintiff stated that she generally watches television during the day and sleeps until noon. [R. at 222]. Plaintiff is able to do laundry and dishes. Plaintiff rarely cooks. [R. at 222]. Plaintiff does not leave the house because she dislikes being around large groups of people. [R. at 224].

## **II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW**

The Commissioner has established a five-step process for the evaluation of social security claims. *See* 20 C.F.R. § 404.1520. Disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . .

42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3]

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572). Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 1521. If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled. If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work. A claimant is not disabled if the claimant can perform his past work. If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*. *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational. *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750. In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance. *Perales*, 402 U.S. at 401. Evidence is not substantial if it is overwhelmed by other evidence in the record. *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards. *Glass*, 43 F.3d at 1395.

---

[4/] Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

## III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Plaintiff could perform a full range of work limited to simple and repetitive tasks, with no more than incidental contact with the general public.  [R. at 20]. Based on the testimony of a vocational expert, the ALJ determined that jobs existed which Plaintiff could perform in the national economy, and that Plaintiff was not disabled.  [R. at 21].

## IV.  REVIEW

**"Treating Physician" Opinion**

Plaintiff asserts that the ALJ failed to give appropriate weight to the opinions of Plaintiff's treating physicians.  Plaintiff references pages 158 and 161 of Plaintiff's transcript and the GAF scores which Plaintiff's therapist attributed to Plaintiff.  Plaintiff notes that her therapist concluded that Plaintiff's GAF was 45 or 46 which Plaintiff references as reflecting a serious impact upon Plaintiff's ability to hold a job.

The record reflects that Karly Wiemar, BA, who Plaintiff lists as her therapist, noted on "Axis V," Plaintiff's "highest" 46 and "current" 45.  [R. at 158].  In addition, a second form was completed by an unknown individual (noted by Plaintiff as her therapist), listing Plaintiff's history and a current GAF of 45 with a fair prognosis.  [R. at 161].

None of the parties discuss whether the opinion of Plaintiff's therapist qualifies as a treating source.  Plaintiff attributes both GAF scores to her therapist.  Defendant discusses the medical evidence but does not further evaluate the source of Plaintiff's GAF scores, which was Plaintiff's therapist.  The social security regulations define which medical sources are "acceptable medical sources" for determining medical impairments.  28 C.F.R.

§ 404.1513. A "treating source" is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. . . ." 20 C.F.R. 404.1502. "Acceptable medical sources" include licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513. Pursuant to the regulations, a therapist is listed as an "other source." 20 C.F.R. § 404.1513 (d)(1). The Court is not persuaded that Plaintiff's therapist qualifies as a "treating physician."

In this case, the ALJ did review and summarize Plaintiff's therapist's notes. The ALJ also noted that Plaintiff's therapist estimated that Plaintiff's GAF was about 45/46. [R. at 19]. The ALJ additionally discussed the consultative examination by Dr. Minor Gordon. The ALJ notes that Plaintiff told Dr. Gordon that her symptoms are well-controlled if she takes her medications. The ALJ's finding is supported by the examination notes from Dr. Gordon. Dr. Gordon indicated Plaintiff's GAF at 70. In addition, the treatment notes from Associated Centers for Therapy discuss Plaintiff's failure to take her medication and a poor prognosis for Plaintiff due to her failure to take her medication. The Court cannot conclude that the ALJ erred by failing to accord controlling weight to the therapist's reference of a 45/46 GAF for Plaintiff. The ALJ's focus was upon Plaintiff's capabilities when Plaintiff was compliant with her medications.

Plaintiff also refers to *Langley v. Barnhart*, 373 F.3d 1116 (10th Cir. 2004). In *Langley* the ALJ erred by not identifying or explaining asserted inconsistencies in opinions of Plaintiff's treating physicians. As noted, in this case, the GAF score was by one of Plaintiff's therapists and does not qualify as a treating source. Further, the ALJ referenced

-- 12 --

the importance of Plaintiff being compliant with her medications and that Plaintiff stated to the examining doctor that her symptoms were well controlled when she took her medications.

**ERRONEOUS RELIANCE ON CONSULTATIVE EXAMINER**

Plaintiff asserts that the ALJ improperly relied upon Dr. Gordon's assessment of Plaintiff's abilities and Dr. Gordon's attributing to Plaintiff a GAF score of 70. Plaintiff suggests that the ALJ erred in not discussing why the ALJ gave more weight to the opinion of Dr. Gordon over that of the Associated Centers for Therapy.

The ALJ did summarize some of the medical records from the Associated Centers for Therapy. Many of the medical records note Plaintiff's failure to comply with her prescribed medication. In addition, Plaintiff's therapist attributed to Plaintiff a GAF score of 45 or 46. The ALJ did note these records in his opinion. Plaintiff does not further specify exactly what medical evidence was ignored by the ALJ.

As discussed above, the Court is not persuaded that Plaintiff's therapist's opinion qualifies as a treating source. The remaining records from the Associated Centers for Therapy are not inconsistent with the ALJ's findings that Plaintiff, if medically compliant, is not disabled. The ALJ noted the opinion of the consultative examiner, Dr. Gordon, stating that Plaintiff "told Dr. Gordon that her symptoms are well controlled if she takes her medication." [R. at 19]. The ALJ further noted that the medical record had been reviewed by two non-examining consultants who concluded Plaintiff had the ability to perform the tasks the ALJ found Plaintiff capable of performing. The Court cannot conclude that the ALJ erred in his evaluation of Dr. Gordon's consultative examination.

**PLAINTIFF'S CREDIBILITY EVALUATION**

Plaintiff generally asserts that the ALJ failed to affirmatively link substantial evidence to his findings and the ALJ failed to indicate the portion of Plaintiff's testimony that the ALJ found not credible. Plaintiff's asserted error is fairly general.

The ALJ noted that Plaintiff reported "during a consultative psychological evaluation that she is able to control her symptoms with medication." [R. at 20]. The ALJ considered Plaintiff's testimony that her symptoms become exaggerated every few years, but noted that assuming such testimony as true Plaintiff's impairment would not reach the durational requirement. The ALJ noted Plaintiff's daily activities and her previous work history. [R. at 20]. Primarily, the ALJ appears focused upon Plaintiff's ability to control her symptoms with proper medication, and Plaintiff's prior ability to work combined with her present day activities. Plaintiff does not refer to any specific testimony or failure by the ALJ to accept specific testimony. The Court is not persuaded that the alleged failure by the ALJ requires reversal.

**ASSERTED OBESITY**

Plaintiff asserts, on appeal, that the ALJ failed to consider the impact that her obesity has upon her emotional disorder. However, the ALJ considered all of the medical evidence and all of Plaintiff's treatment records. Presumably any impact upon Plaintiff from her obesity should be included in the medical records. Plaintiff fails to identify any specific information or limitations that the ALJ ignored due to Plaintiff's obesity. The medical record contains no specific emotional or physical impact upon Plaintiff by Plaintiff's obesity. The ALJ cannot consider the impact of a "condition" in a vacuum. The record must contain some evidence to substantiate the impact of an asserted disorder which Plaintiff requests

-- 14 --

the ALJ to evaluate.  In this case, the ALJ's opinion is supported by substantial evidence.

Dated this 31st day of January 2006.

*Sam A. Joyner*
Sam A. Joyner
United States Magistrate Judge